Clyde R. DONNELL, et al., Appellants,

v.

UNITED STATES of America.

Clyde R. DONNELL, et al.

v.

UNITED STATES of America, Eddie Thomas, Sr., et al., Appellants.

Nos. 81–1471, 81–1545.

United States Court of Appeals, District of Columbia Circuit.

Argued 26 Feb. 1982.

Decided 25 June 1982.

---

Gerald Braddock, of the bar of the Supreme Court of Mississippi, pro hac vice by special leave of the Court, Vicksburg, Miss., and George C. Cochran, for Donnell, et al., appellants in No. 81–1471 and cross-appellees in No. 81–1545. Douglas C. Herbert, Jr. and F. Joseph Nealon, Washington, D. C., also entered appearances for Donnell, et al.

Frank R. Parker, Jackson, Miss., with whom William L. Robinson, Washington, D. C., was on the brief for Eddie Thomas, Sr., et al., appellees in No. 81–1471 and cross-appellants in No. 81–1545.

Walter W. Barnett, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellee, United States of America.

Before TAMM and WILKEY, Circuit Judges, and GESELL,* United States District Judge for the District of Columbia.

WILKEY, Circuit Judge:

This is an appeal from the district court's award of $73,669.88 in attorneys' fees to appellees, defendant-intervenors below in a suit under section 5 of the Voting Rights Act.[1] Appellants challenge the intervenors' entitlement to any fees at all, as well as the court's particular determinations in calcu-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 42 U.S.C. § 1973c (1976).

lating the award. Appellees have cross-appealed, arguing that the district court erred in choosing the geographical market for determining the appropriate hourly rate. We find merit in both positions, and reverse and remand to the district court for further proceedings.

## I. BACKGROUND

### A. *The Merits Litigation*

In 1970 the Board of Supervisors of Warren County, Mississippi, adopted a redistricting plan which failed to receive approval of the United States Attorney General and ultimately was enjoined by the District Court for the Southern District of Mississippi because it diluted black voting strength.[2] In 1978 the Board adopted a new plan. Rather than seeking approval of the Attorney General, the Board brought an action against the United States in the District Court for the District of Columbia seeking a declaratory judgment that the new plan did not have a racially discriminatory purpose or effect. Seven black voters in Warren County intervened on the side of the United States.

After a year and a half of discovery, the district court ruled on 31 July 1979 that plaintiffs were not entitled to a declaratory judgment. The court held that the Board had failed to provide a legitimate nonracial justification for its plan, which would diminish black voting strength. On 19 February 1980 the Supreme Court summarily affirmed.[3]

Subsequently a new private action was filed in the District Court for the Southern District of Mississippi challenging the preexisting voting districts. Finding the districts unconstitutional, the district court imposed a plan proposed by the Department of Justice.[4] In elections held under this plan several black officials were elected.

### B. *Award of Attorneys' Fees to Intervenor-Defendants*

On 1 May 1980 intervenors filed a motion for an award of $89,109.38 in attorneys' fees pursuant to Title 42, U.S.C. section 1973*l* (e), which authorizes the district court to award a reasonable fee to the prevailing party.[5] The request covered 381.05 hours worked by lead counsel Frank Parker, chief counsel for the Jackson, Mississippi, office of the Lawyers' Committee for Civil Rights Under Law; 191.35 hours worked by James Winfield, a practitioner in Vicksburg, Mississippi; 47 hours worked by Richard Kohn, an attorney with the Lawyers' Committee's Washington, D. C., office; and 30 hours worked by Barbara Phillips, a Lawyers' Committee attorney who worked on the attorneys' fees application. Parker and Kohn requested an award at the rate of $100 per hour, Winfield at the rate of $77 per hour, and Phillips at the rate of $75 per hour; the requested rates for Parker and Kohn were based on the District of Columbia market, whereas the markets relied on by Winfield and Phillips were not specified. Multiplying rates by hours resulted in a lodestar of $59,406.25. In addition, intervenors requested an upward adjustment of the lodestar by a factor of fifty percent, which would produce a total of $89,109.38.

Appellants opposed the request on several grounds, and also requested an evidentiary hearing, which the district court denied. On 19 February 1981 intervenors were awarded $50,400 in attorneys' fees. The court found that the relevant geographical market was Mississippi rather than the District of Columbia, and awarded hourly rates it found prevailing in Mississippi: $60 an hour for Parker and Kohn, $50 an hour for Winfield, and $40 an hour for Phillips. The court allowed all hours claimed by all attor-

---

2. *See United States v. Board of Supervisors*, 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977).

3. *Donnell v. United States*, Civ. No. 78–0392 (D.D.C. 31 July 1979) (three-judge court), *aff'd mem.*, 444 U.S. 1059, 100 S.Ct. 1000, 62 L.Ed.2d 743 (1980).

4. *Stokes v. Warren County Election Comm'n*, Civ. No. J79–0425(c) (S.D.Miss. 20 Sept. 1979).

5. 42 U.S.C. § 1973*l* (e) (1976).

neys, except for 9.2 hours of deposition time claimed by Winfield but specifically contested in affidavits filed by appellants. The court then increased the lodestar figure by fifty percent, citing the contingent nature of the representation, the novel issues presented in the case, and the attorneys' unusually high quality of representation.

Intervenors subsequently sought reconsideration of the award based on recent decisions allowing hourly rates in Mississippi in excess of those allowed in the original decision. On 20 March 1981 the court amended its award by increasing the hourly rate for Parker and Kohn to $85 per hour and for Winfield and Phillips to $60 per hour. The court's ruling on the number of hours expended and on the adjustment to lodestar remained the same, resulting in a total award of $73,699.88.

This appeal followed. Appellants challenge intervenors' entitlement to any award, as well as the reasonableness of the hours worked by Winfield, Parker, and Kohn, the hourly rates awarded by the district court, and the fifty percent adjustment factor. Intervenors, appellees here, have cross-appealed on the issue of the hourly rates. They assert that the court erroneously used Mississippi rates rather than rates in the District of Columbia, where the suit was brought.

We now reverse and remand to the district court for further proceedings.

## II. ENTITLEMENT TO FEES

Title 42 U.S.C. section 1973*l*(e) provides:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.[6]

The purpose of this provision, as well as of section 1988,[7] a similar provision providing for award of attorneys' fees to prevailing parties in civil rights cases generally, is the familiar one of encouraging private litigants to act as "private attorneys general" in seeking to vindicate the civil rights laws. As the Senate Report on section 1973*l*(e) stated, "Congress depends heavily upon private citizens to enforce the fundamental rights involved. The awards are a necessary means of enabling private citizens to vindicate these Federal rights."[8] Although awarding fees pursuant to section 1973*l*(e) is discretionary, the legislative history makes clear that a prevailing party usually should recover fees: "A party seeking to enforce the rights protected by the Constitutional clause or statute under which fees are authorized by these sections, if successful, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' *Newman v. Piggy [Piggie] Park Enterprises, Inc.,* 390 U.S. 400, 402 [88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)."[9]

Had this been a successful suit by these intervenors as plaintiffs against the Board of Supervisors, then, their entitlement to attorneys' fees would hardly be in doubt. The result of the litigation furthered the purpose of the Voting Rights Act. This case presents a more difficult problem, however, because the suit was brought by the Board of Supervisors against the United States, as represented by the Department of Justice. Intervenors participated on the side of the Department of Justice, but the significance of their efforts is in controversy. Appellants contend that intervenors' participation was subordinate and indeed unnecessary. They believe that the Department of Justice needed no aid in defending the suit, and prevailed on the basis of its own efforts. In appellants' view this dupli-

---

**6.** *Id.*

**7.** *Id.* § 1988. The legislative purposes underlying § 1988 and § 1973*l*(e) are identical, and the two therefore should be construed similarly. *See, e.g., Riddell v. National Democratic Party,* 624 F.2d 539, 543 (5th Cir. 1980).

**8.** S.Rep.No.295, 94th Cong., 1st Sess. 40 (1975), U.S.Code Cong. & Admin.News 1978, pp. 774, 807.

**9.** *Id.*

cative role constitutes a "special circumstance" that renders an award of fees unjust. Intervenors counter that their aggressive litigation efforts impelled the Department of Justice into a strong defense, and that they produced facts and arguments of substantial value to the district court.

■ The legislative history of section 1973*l*(e) is silent on the appropriate standard for awarding attorneys' fees to intervenors who participate on the side of the United States in a successful suit. There is a single reference to attorneys' fees for such a party: "In the large majority of cases the party or parties seeking to enforce [civil] rights will be the plaintiffs and/or plaintiff-intervenors. However, in the procedural posture of some cases (*e.g.*, a declaratory judgment suit under Sec. 5 of the Voting Rights Act), the parties seeking to enforce such rights may be the defendants and/or defendant-intervenors."[10] This indicates that intervenors may be considered as prevailing parties entitled to an award of attorneys' fees. But we do not believe Congress intended that such an award be as nearly automatic as it is for a party prevailing in its own right.

In the first place, the legislative history of sections 1973*l*(e) and 1988 emphasizes over and over again the critical goal of enabling private citizens to serve as "private attorneys general" in bringing suits to vindicate the civil rights laws. A typical statement of this purpose was made by Representative Holtzman during the House debates on the Civil Rights Attorneys' Fees Awards Act of 1976, which enacted section 1988:

> Plaintiffs who suffer discrimination and other infringements of their civil rights are usually not wealthy people. The organizations who have helped them bring their cases are frequently not well financed. The Justice Department does not have the resources to bring suit for every civil rights violation. Thus, many people, deprived of their civil rights, may not as a practical matter be able to do anything about it. It is not right to deny people who cannot afford to pay attorneys' fees the availability of justice through our courts.[11]

We think appellants have a valid point that this objective is far less compelling when the actual Attorney General participates in the case. Indeed, when the Justice Department defends a suit under section 5 it is acting on behalf of those whose rights are affected. It cannot be said that rights are being denied because of inability to pay attorneys' fees.

Appellees respond that their role differed from that of the Justice Department because their interests as voters in Warren County differed from the Department's interest as a whole. While there may be instances in which such a divergence exists between a defendant and a defendant-intervenor,[12] this was not the case here. The

---

10. *Id.* at 40 n.42, U.S.Code Cong. & Admin. News 1975, p. 807. Likewise, the legislative history of § 1988 contains only this one reference to fees for intervenors. *See* S.Rep.No. 1011, 94th Cong., 2d Sess. 4 (1976), U.S.Code Cong. & Admin.News 1978, p. 5908.

11. 122 Cong.Rec. 35127 (1 Oct. 1976) (remarks of Rep. Holtzman).

12. For example, in *Baker v. City of Detroit*, 504 F.Supp. 841 (E.D.Mich.1980), defendant-intervenors black police officers recovered attorneys' fees for their role in successfully defending a suit brought by the police officers' union against Detroit challenging an affirmative action plan voluntarily adopted by the city. The court noted that the city would be reluctant to admit that it had in the past discriminated against black officers, a reluctance which

might impair its defense of the affirmative action plan.

A similar and even more significant, case is *Seattle School Dist. No. 1 v. Washington*, 633 F.2d 1338 (9th Cir. 1980), *prob. juris. noted*, 454 U.S. 890, 102 S.Ct. 384, 70 L.Ed.2d 204 (1981). A school district sued to have a state initiative, which had the effect of outlawing the district's voluntary school desegregation program, declared unconstitutional under the fourteenth amendment. Eight public interest groups intervened in support of the district, and raised the alternative argument that the district operated an unconstitutional dual school system. The district court found the initiative unconstitutional, but subsequently refused to award any attorneys' fees to intervenors. The Ninth Circuit affirmed on the merits and partly reversed on the fees issue. It held

interest of both the Attorney General and appellees was in preventing a dilution of black voting strength. We will not lightly infer that the Justice Department has violated this statutory obligation. In discussing the court's power to prevent intervention in proceedings for a declaratory judgment under section 4(a) of the Voting Rights Act, which is parallel to the provision in section 5, Judge Leventhal held for a three-judge district court:

Congress assigned to the Attorney General the primary role in vindicating the public interest under the Act. We should be reluctant indeed to permit intervention ... in the absence of a plausible claim that the Attorney General is not adequately performing his statutory function, and that intervention is needed to enable the court properly to perform its declaratory function or in some other way to protect the public interest.

However, if the Attorney General has been derelict or deficient, if the fact-finding process is warped or inadequate, the court has the authority and indeed may have the duty to allow intervention to cure or leave the deficiencies. Such intervention is not to be permitted except upon a strong showing.[13]

■ Not only is it assumed that the Attorney General will represent the interest of black voters, but the outcome of a declaratory judgment suit under section 5 does not bind private parties. Section 1973c provides that "a declaratory judgment entered under this section shall [not] bar a subsequent action to enjoin enforcement of [the voting] qualification, prerequisite, standard, practice, or procedure."[14] This further buttresses Judge Leventhal's point that the need for intervention in a declaratory judgment suit is quite limited. To adopt a standard that would permit an award of attorneys' fees in every case in which an intervenor participated on the side of the Department of Justice in a successful suit would encourage intervention even where there is no special need for it. It may be that the district courts have gotten away from Judge Leventhal's admonition and have been permitting intervention as a matter of course, but this is only an additional reason for carefully evaluating intervenors' fee requests.

■ Given this background, we believe that in considering an intervenor's request for attorneys' fees the district court is obligated to examine the particular role played by the intervenor in the lawsuit. Although this question has not been definitely resolved before today, analogous holdings have been laid down. Courts have held that one type of "special circumstance" that creates an exception to the ordinary presumption in favor of granting attorneys' fees to a prevailing party is "where, although plaintiffs received the benefits sought in the lawsuit, their efforts did not contribute to achieving those results."[15] An example is where a lawsuit was filed to achieve an objective that was already being achieved independently.[16] We think the

that intervenors were entitled to fees on the second issue, since the school district, like the city of Detroit in *Baker*, would not have raised the argument that the system was unconstitutional. But the Ninth Circuit affirmed the district court's decision to deny fees on the first issue in the case, which was adequately covered by the school district. *See id.* at 1349. The *Ninth Circuit thus held, as we do today, that intervenors may be denied fees where their participation was unnecessary in light of the efforts of the prevailing governmental litigant.*

13. *Apache County v. United States,* 256 F.Supp. 903, 908 (D.D.C.1966) (three-judge court). *See also NAACP v. New York,* 413 U.S. 345, 368, 93 S.Ct. 2591, 2604, 37 L.Ed.2d 648 (1973) (upholding refusal to allow interven-

tion where motion to intervene was untimely, noting that appellants did not substantiate their claim that the United States inadequately represented their interests).

14. 42 U.S.C. § 1973c (1976).

15. *Connor v. Winter,* 519 F.Supp. 1337, 1343 (S.D.Miss.1981) (three-judge court).

16. *See, e.g., Bush v. Bays,* 463 F.Supp. 59, 66 (E.D.Va.1978) (holding alternatively that plaintiffs were not prevailing parties and that an award would be unjust under the "special circumstances" doctrine) ("It is apparent to the Court that the attorneys for the plaintiffs in this case merely caught hold of a train on its way out of the station and are seeking to ride it

same principle applies here as well. If a lawsuit is successful, but the intervenor contributed little or nothing of substance in producing that outcome, then fees should not be awarded.[17]

■ This holding is fully consistent with the few instances in which private parties have recovered fees under section 1988 even though a governmental entity was litigating on their side. In *Wade v. Mississippi Co-operative Extension Service*,[18] for example, the losing party challenged the *plaintiffs'* entitlement to fees on the theory that the Justice Department, as plaintiff-intervenor, had done the bulk of the work. The court awarded fees to plaintiffs after finding that "counsel for the private plaintiffs, instead of playing a passive role, actively participated throughout in the prosecution of the case, assumed a great measure of responsibility for presenting evidence and independently prepared and submitted various legal memoranda of value to the court."[19] This is precisely the kind of determination we hold the district court must make if fees are to be awarded.[20]

Our holding is also consistent with this court's refusal in *Alabama Power Co. v. Gorsuch*[21] to award attorneys' fees to an intervenor participating on the side of the Environmental Protection Agency (EPA), which prevailed in a suit brought by industry petitioners. As Chief Judge Robinson stated for the court:

> If ever an intervenor can recover attorneys' fees from a party on whose side it participated—a question we do not here reach—the justification would have to be a clear showing of some unique contribution of the intervenor to the strength of that party's legal position. Here, the environmental groups have not demonstrated with any sort of particularity that their intervention added in any essential way to EPA's stance on the issues involved. Without deciding more, we hold that wherever the bounds on fee awards to such intervenors should be set, this threshold burden has not been met.[22]

■ In *Alabama Power* the intervenors sought an award from the EPA, the very governmental entity that had prevailed in the suit, whereas here intervenors seek attorneys' fees from appellants, who lost the suit. Nonetheless, we believe that the essential principle is the same in both situations. Where Congress has charged a governmental entity to enforce a statutory provision, and the entity successfully does so, an intervenor should be awarded attorneys' fees only if it contributed substantially to

---

to a substantial award of attorneys' fees. Plaintiffs' lawsuit played no part in firing the boiler, getting up a head of steam, or opening the throttle. Plaintiffs just went along for the ride.")

17. The Ninth Circuit has agreed that fees may be denied intervenors under these circumstances. *See* note 12 *supra*.

18. 378 F.Supp. 1251 (N.D.Miss.1974), *vacated on other grounds*, 528 F.2d 508 (5th Cir. 1976), *award reinstated on remand*, 424 F.Supp. 1242 (N.D.Miss.1976).

19. *Id.* at 1254. Cases such as *Wade*, where the private parties brought the suit and the governmental entity later intervened, obviously present a stronger case for award of fees. *See also United States v. Georgia Power Co.*, 474 F.2d 906, 927 (5th Cir. 1973) (award of fees to plaintiff in Title VII suit, which was joined by Attorney General).

20. Other courts making awards in similar circumstances have also treated the entitlement issue as open, rather than holding, as appellees would have us do here, that being on the successful side is sufficient for obtaining an award of fees. *See, e.g., Northcross v. Bd. of Educ.*, 611 F.2d 624, 640 (6th Cir. 1979) (upholding award of fees to plaintiffs, who were joined in action by governmental entity, because specific finding by district court "disposes of any suggestion that the services ... were not essential"), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). *See also Usery v. Local Union No. 639 Int'l Bhd. of Teamsters*, 543 F.2d 369, 388 (D.C.Cir.1976) upholding authority to award fees to intervenors under Labor-Management Reporting and Disclosure Act because ("[t]he efforts of union member intervenors may be of considerable assistance to the court and the Secretary, warranting assessment against the party ultimately benefitted—the union membership"), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977).

21. 672 F.2d 1 (D.C.Cir.1982).

22. *Id.* at 4.

the success of the litigation. This inquiry primarily entails determining whether the governmental litigant adequately represented the intervenors' interests by diligently defending the suit. It also entails considering both whether the intervenors proposed different theories and arguments for the court's consideration and whether the work it performed was of important value to the court.

■ By providing for attorneys' fees to be awarded in actions brought to vindicate the civil rights laws, Congress did not intend to allow private litigants to ride the back of the Justice Department to an easy award of attorneys' fees. Obviously, if an intervenor did nothing but simply show up at depositions, hearings, and the trial itself, and spend lots of time reading the parties' documents, an award of attorneys' fees would be inappropriate. The same would be true if the intervenors' submissions and arguments were mostly redundant of the Government's or were otherwise unhelpful. We do not say that this is true of intervenors here, but only that the district court should find out and assess the significance of their efforts in the case.

The court failed to make this determination, leaving the parties' vigorous dispute unresolved. Appellants claim that intervenors contributed nothing the Government did not also contribute, pointing as an example to intervenors' failure to submit their own proposed findings of fact and conclusions of law. Intervenors contend that the Justice Department's proposed findings and conclusions were the product of both the Department and intervenors, and in general they argue that their efforts were critical in forcing the Justice Department to conduct an active defense. On remand the district court should resolve this controversy and determine if fees are appropriate.

## III. CALCULATION OF THE FEES

In this section we deal with the challenges raised by both parties to the district court's calculation of the amount of fees awarded. Of course, if the district court on remand finds that intervenors are not entitled to any fees, the discussion in this section will become moot.

### A. *Hours Reasonably Expended*

Appellants challenge the number of hours attorneys for appellees claim to have worked on this case, asserting primarily that there was substantial duplication among the tasks performed by the three attorneys who worked on the merits of the litigation.[23] In particular they challenge the billing hours attributed to Winfield, the local Mississippi attorney for appellees. For example, appellants note that twenty-five entries by Winfield of time spent analyzing various documents are identical to those reported by lead counsel Parker. Based on this, appellants claim that the district court should conduct an evidentiary hearing to determine not only whether these entries were indeed duplicative and unnecessary, but also whether Winfield performed any substantial function in the proceedings at all. In addition, appellants allege that the time spent by Kohn, the District of Columbia counsel, was unnecessary, and that Parker also spent an excessive amount of time on the case.

The district court brushed off these objections summarily:

Intervenors' attorneys provided detailed records of the time logged and services rendered. The Court has examined them carefully and finds that they are reasonable. The duplication of hours between attorneys for certain work, which was pointed out by the plaintiffs, does not concern the Court. This case was a complicated one entailing extensive document work. It necessarily involved some duplication of effort by the attorneys so that each could understand the case properly.[24]

The court went on to approve all hours submitted, with the exception of 9.2 hours submitted by Winfield for time spent at

23. The hours worked by Phillips on the attorneys' fees application are not in controversy.

24. Civ. No. 78–392, memorandum opinion (mem. op.) at 4 (D.D.C. 18 Feb. 1981).

depositions, where the plaintiffs had submitted affidavits from the deponents stating that Winfield was not present.

█ We find no fault with the district court's decision to allow all the hours claimed by Kohn and Parker. The only challenge appellants have raised with regard to Kohn is that his role was entirely redundant. But we believe it was reasonable for appellees to have an attorney in Washington, D. C., who was prepared to take whatever actions might be necessary in the district court. The hours submitted by Kohn seem reasonable, and given the absence of any particular challenge by appellants we can find no problem with the court's decision.

█ Appellants similarly have failed to specify their challenges to Parker's claimed hours. We emphasize that the party challenging an application for fees should frame its objections with specificity. The district court cannot inquire into the reasonableness of every action taken and every hour spent by counsel, and it will consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive.[25] No such basis exists here, and we uphold the decision regarding Parker's hours.

█ We find that the district court erred, however, in refusing to inquire into the matter of hours worked by Winfield. In *Copeland v. Marshall* we stated: "It is axiomatic that we cannot identify an unreasonable award unless it is accompanied by a statement of reasons."[26] In this instance appellants raised specific and substantial

questions about Winfield's hours worked, yet the district court never stated specifically why it found no merit in appellants' claims. Although the court may be correct that a complicated case "necessarily involves some duplication of effort," that rationale cannot be dispositive. The submission of so many identical time entries inevitably raises questions about exactly what the attorneys did and whether it was necessary. And given the different roles played by Winfield and Parker, their submission of identical time records for analyzing these many documents presents the question whether such extensive duplication was warranted.[27]

This is especially true given the prior question whether intervenors played a necessary role in this case at all. Even if the district court finds that intervenors' participation in the case was important and substantial, there yet remains the question whether this participation needed to be so extensive given the central role played by four attorneys from the Department of Justice.[28] Appellants have raised compelling questions regarding Winfield's participation, particularly in light of the leading and sometimes almost exclusive role Parker assumed on behalf of intervenors. Parker is an extremely experienced voting rights attorney, and he has participated extensively in Mississippi litigation. Even if some additional local expertise was needed, which was intervenors' justification for Winfield's participation in the litigation, there is an open question whether there was a need for the local attorney to read every document and otherwise act as a major co-counsel.

**25.** *See generally National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319 at 1329–30 (D.C.Cir.1982); *Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (en banc).

**26.** 641 F.2d 880, 901 n.39 (D.C.Cir.1980) (en banc).

**27.** The issue is not whether intervenors used too many attorneys, but whether the work performed was unnecessary. *See, e.g., Tasby v. Estes,* 651 F.2d 287, 289 (5th Cir. 1981). Even if there was justification for the use of three attorneys performing different roles, that does

not necessarily imply that every attorney needed to read every document in the case. And the existence of numerous identical time submissions raises a question whether each attorney actually did read every document or whether each attorney had an accurate understanding of his particular role in the litigation.

**28.** *Cf. Baker v. City of Detroit,* 504 F.Supp. 841, 851 (E.D.Mich.1980) (awarding fees to intervenors, noting "that this sum should not be onerous" because "intervenors did not take part in most pre-trial discovery" and "played a subsidiary role [at trial]").

The fact that Winfield's time submissions in a great many instances are identical to those of Parker only adds to the need for an investigation of this issue.

In *National Association of Concerned Veterans v. Secretary of Defense*[29] this court emphasized that in most cases questions regarding an attorneys' fee application can be resolved without an evidentiary hearing. We also held, however, that "procedural fairness requires that a hearing be held where in the District Court's view material issues of fact that may substantially affect the size of the award remain in well-founded dispute."[30] We hold that the district court abused its discretion in summarily resolving the issues with regard to Winfield's time submission. On remand an evidentiary hearing should be held to determine the reasonableness of the time charges submitted by Winfield. The district court should consider any specific challenges by appellants to Winfield's participation, such as their objections to the duplicative entries and to the generalized billing of twenty hours for time spent with clients.

## B. *Reasonable Hourly Rate*

Both parties have appealed on the hourly rate issue. Appellants challenge the rates awarded as excessive. The court initially awarded $60 per hour for Parker and Kohn, $50 per hour for Winfield, and $40 per hour for Phillips. It subsequently increased these rates to $85 per hour for Parker and Kohn and $60 per hour for Winfield and Phillips. This increase was in response to intervenors' motion for reconsideration based on recent decisions awarding attorneys' fees for litigation in Mississippi. Although appellees thus were awarded rates in excess of those appellants claim are the maximum for experienced attorneys in Mississippi, appellees have cross-appealed claiming that the district court should have based their fees on the customary rates charged in the District of Columbia, where the lawsuit was filed.

We uphold the cross-appeal with regard to Parker, Kohn, and Phillips, finding that these attorneys are entitled to rates customarily charged in the District of Columbia. On remand the district court should determine the hourly rates to be awarded to these three attorneys. We hold that Winfield's rates should be determined on the basis of the prevailing market rate in Mississippi, as his participation in the case was premised entirely on his local expertise. We vacate the district court's award of $60 per hour to Winfield, and remand for a new determination of his appropriate hourly rate.

*Copeland v. Marshall* held: "The reasonable hourly rate is that prevailing in the community for similar work."[31] Usually no problem arises in choosing the relevant community because the lawyers work in the community in which the suit was brought. The difficulty arises when lawyers come from out of town to litigate the suit. The issue here is whether the relevant community is the District of Columbia, where the suit was brought, or Mississippi, which was the source of the controversy at issue and the place where most of the work was performed.

We recognize the logic on both sides of the argument, but hold that the proper rule is that the relevant community is the one in which the district court sits. This is a simple rule to follow. It requires the district court normally to determine only the prevailing market rate within its jurisdiction, an inquiry about which it should develop expertise. Moreover, it is a neutral rule which will not work to any clear advantage for either those seeking attorneys' fees or those paying them. High-priced attorneys coming into a jurisdiction in which market rates are lower will have to accept those lower rates for litigation performed there. Similarly, some attorneys may receive fees based on rates higher than they normally command if those higher rates are the norm for the

**29.** 675 F.2d 1319 (D.C.Cir.1982).

**30.** *Id.*, at 1330.

**31.** 641 F.2d at 892.

**252**

jurisdiction in which the suit was litigated. Although there may be cases, such as this one, where much of the work must be performed away from the district court's community, we do not believe that this alone provides a sufficient reason for deviating from the general rule. This position is consistent with that of other federal courts.[32]

■ There are some situations, however, in which the rule should not be followed. Courts have held that the hourly rate of the Lawyer's community, as opposed to the district court's community, should be awarded if there are compelling reasons why the services performed by that attorney were unavailable within the court's jurisdiction. For example, the Seventh Circuit has stated:

> If a high priced, out of town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally.[33]

Thus, if a *particular* attorney's services are necessary, the proper hourly rate is that prevailing in that attorney's local community.

■ Applying these criteria to this case, we find that Parker, Kohn, and Phillips should have been awarded District of Columbia hourly rates. Kohn served entirely as Washington, D. C., counsel, and thus D. C. rates are entirely appropriate. Parker served as lead counsel, making him responsible for all intervenors' positions in the

case, including at the trial itself. Although he works primarily out of Mississippi, his role in the litigation extended to the trial in D. C. as well as the gathering of evidence in Mississippi. District of Columbia rates are therefore appropriate. Finally, Phillips is also entitled to D. C. rates, even though she works in the Lawyers' Committee's Mississippi office. Her function of preparing the attorneys' fees application was directed entirely toward convincing the district court, and it could have been done by any local District of Columbia attorney.

■ The appropriate rate for Winfield, in contrast, is that prevailing in Mississippi. His role in the case fits squarely within the exception to the rule that the district court's community should be used in determining the hourly rate. The justification for Winfield's participation in the case was, in appellees' own words,

> "his expertise in and extensive knowledge of local Warren County conditions, particularly the location of black population concentrations in Vicksburg and Warren County, population shifts since the 1970 Census, the location of streets and other boundaries used in the plaintiffs' proposed redistricting plan, the history of discrimination against black people in Warren County, and the current grievances of the black community against the Board of Supervisors." [34]

Winfield thus was hired for his particular expertise, and his function could not have been duplicated by an attorney from the District of Columbia. The proper hourly rate, therefore, is the normal one in Mississippi.

■ The district court awarded Winfield $60 per hour, but we vacate this award and remand for a new determination. Intervenors sought to recover District of Co-

---

**32.** *See, e.g., McPherson v. School Dist. # 186,* 465 F.Supp. 749, 760 (S.D.Ill.1978); *Donaldson v. O'Connor,* 454 F.Supp. 311, 314 (N.D.Fla. 1978) (citing cases).

**33.** *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 at 768 (7th Cir. 1982). *See also Donaldson v. O'Connor,* 454 F.Supp. 311, 315 (N.D.Fla.1978) (holding that "where, as here, a plaintiff can

show he has been unable through diligent, good faith efforts to retain local counsel, attorney's fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried.").

**34.** Brief for Appellees at 27.

lumbia rates for all their attorneys, and thus provided little evidence on Mississippi rates. Winfield simply asserted that "[f]or a case of this magnitude and significance, my hourly rate is $75.00 per hour."[35] If this was meant to indicate the rate Winfield normally charges when he performs work for a fee, then he should provide specific supporting evidence, as required by *National Association of Concerned Veterans*.[36] The cases provided by intervenors showing rates awarded for Mississippi services in other litigations are legitimate pieces of evidence, though the weight given them by the district court should depend on whether "they were determined based on actual evidence of prevailing market rates, the attorneys involved had similar qualifications, and issues of comparable complexity were raised."[37] Any further evidence adduced by Winfield in support of his claimed rate, or evidence offered by appellants to support a lower rate, should be evaluated in accordance with *Concerned Veterans*, as of course should the evidence regarding the rates for the other three attorneys.

### C. Adjustments to the Lodestar

The final point of contention is the district court's decision to adjust the lodestar upward by a factor of 1.5. The court reasoned as follows:

> This case was a contingent one for intervenors' attorneys, who work for a private charitable civil rights legal organization, the Lawyers' Committee for Civil Rights. The Lawyers' Committee has no fee arrangement with its clients and is substan-

tially dependent upon court awards of attorneys' fees to continue its work. Additionally, this case presented issues of first impression to this Court. It is the first one in which a proposed plan to redistrict a county was challenged as racially discriminatory and as an attempt to gerrymander district lines to dilute the black voting strength. Finally, the intervenors' quality of representation was unusually and consistently high.[38]

We vacate this aspect of the award and remand for a new determination of what adjustment, if any, should be made to the lodestar.

▪ In *Copeland v. Marshall* this court held that an adjustment to the lodestar may be appropriate to compensate for certain factors such as the contingent nature of success, delay in receipt of payment, and the quality of representation. The decision left open the possibility that other factors may be relevant in adjusting the lodestar up or down, but these three have remained the basic considerations.[39]

▪ Applying this framework to the district court's reasoning in support of the upward adjustment, we first note that the court improperly relied on its view that the case presented issues of first impression. We do not believe such a consideration is appropriate in determining whether to adjust the lodestar fee.[40] If a case was particularly difficult, it probably required a large number of hours of attorney time, a factor which will show up in the lodestar calcula-

---

**35.** Affidavit of James E. Winfield at 4, *reprinted in* J.A. at 34.

**36.** 675 F.2d at 1325–26.

**37.** *Id.* at 1325 n.7.

**38.** Mem. op. at 4–5, *reprinted in* J.A. at 16–17.

**39.** 641 F.2d at 892–94.

**40.** Even were we to find this consideration relevant, we would disagree with the district court that this case presented issues of first impression. That this was the first case in this circuit to deal with *county* redistricting is not dispositive. This circuit has dealt before with cases

under the Voting Rights Act involving the legality of a redistricting scheme. *See, e.g., Mississippi v. United States*, 490 F.Supp. 569 (D.D.C. 1979) (three-judge district court), *aff'd mem.*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). We perceive no difference between the applicable law on county redistricting and that on redistricting of other governmental jurisdictions. Moreover, many county redistricting cases have been decided elsewhere. Intervenors' lead counsel Parker alone has listed five Mississippi county redistricting cases on which he served as lead counsel for black plaintiffs. Affidavit of Frank R. Parker at 7, *reprinted in* J.A. at 29.

tion.[41] And if especially talented counsel were necessary to litigate the case, this fact will be reflected in the hourly rate used in setting the lodestar fee. In addition, the complexity and uncertainty of the issues in the case are considerations in determining whether there was a possibility that no fees would be recovered and therefore whether a contingency adjustment is appropriate.[42] Finally, there remains a possibility of upward adjustment based upon the quality of a representation or the nature of the results achieved. Any further consideration of the first impression nature of the issues is therefore unwarranted as it would be duplicative.

■ The district court properly considered the contingent nature of the representation by attorneys for appellees. Appellants have not asserted the existence of a fee arrangement between appellees and their attorneys, and accordingly it was proper to provide an adjustment for the contingency that no fees would be awarded.[43] An additional factor which the district court could have considered, but did not, was the delay in payment of the fees. Of course, as we cautioned in *Copeland*, "if the 'lodestar' itself is based on *present* hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered, the harm resulting from delay in payment may be largely reduced or eliminated." [44]

■ We disagree strongly, however, with the district court's decision to base the adjustment in part on its view that "the intervenors' quality of representation was unusually and consistently high." [45] We have found it all too common for the district courts to adjust the lodestar upward to reflect what the courts view as a high level of quality of representation. This trend should stop. *Copeland* contemplated such adjustments only for rare cases: "A quality adjustment is appropriate only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the 'lodestar.' " [46] As we stated in *Concerned Veterans*: "The Court could not have stated in clearer terms that an adjustment for the quality of representation should not be routinely awarded but only awarded in exceptional cases. An adjustment should not be made out of sympathy for claimant's cause or to mollify counsel because the lodestar figure claimed was reduced." [47]

Of course it remains within the district court's discretion to make this quality determination. But in this case the district court's own opinion demonstrates conclusively that a quality adjustment was not warranted. In the initial part of its opinion discussing the reasonable hourly rates, the court stated:

> Frank Parker, the lead counsel, is an experienced and able specialist in the field of reapportionment and county redistricting. In the instant litigation, he presented his case with efficiency and clarity. His performance was generally of high quality. James Winfield and Richard Kohn, while not specialists in their field,

41. See Copeland, 641 F.2d at 890.

42. *See* note 43 *infra*. *See also Environmental Defense Fund, Inc. v. EPA*, 672 F.2d 42, 60–61 (D.C.Cir.1982) ("It is true that the case is extremely important and very complicated, and that EDF counsel performed with great skill; however, these factors are fully compensated by the amounts credited under the categories of 'hours reasonably expended' and 'reasonably hourly rates.' ").

43. The court should, however, inquire specifically into the actual probability that intervenors would have lost the case and thus recovered no fees. *See Copeland*, 641 F.2d at 893 (Since "it is difficult in hindsight to determine the risk of failure at the commencement of a lawsuit that ultimately proved to be successful ... we ask only that the district court judges exercise their discretion as conscientiously as possible, and state their reasons as clearly as possible.")

44. *Id.* at 893 n.23. *See also Concerned Veterans*, at 1328.

45. Mem. op. at 5, *reprinted in* J.A. at 17.

46. 641 F.2d at 893.

47. At 1328.

also ably represented their clients. Barbara Phillips, a recent law school graduate, prepared the intervenors' application for attorneys' fees and costs.[48]

As regards Phillips, it is obvious that the district court found nothing exceptional in her performance. Indeed, it is almost incredible that her performance could have been exceptional, given that her function was simply to prepare the application for attorneys' fees and costs. As regards Winfield and Kohn, the district court found that they "ably represented their clients." Far from representing an unusually high quality of representation, "able representation" is the minimum that every client is entitled to expect from his attorney. And "efficiency and clarity" and performance "generally of high quality," which was how the district court described Parker's performance, is precisely what one would expect from an attorney particularly experienced in this field serving as a party's lead counsel in a complex litigation. Based on these descriptions the district court's determination that attorneys for appellees were entitled to an upward adjustment for the quality of their representation was erroneous as a matter of law.[49]

We hasten to emphasize that in no way do we denigrate the capabilities and performances in this litigation of the attorneys for appellees. But the district court made every effort to ensure that these attorneys were awarded an appropriate market rate for attorneys of their experience and for this type of litigation. We have no doubt that the district court will do the same on remand, if it finds fees are warranted, when it determines the appropriate District of Columbia rates for Parker, Kohn, and Phillips, and the appropriate Mississippi rate for Winfield. But as this court recently held in *Environmental Defense Fund, Inc. v. EPA*, no quality adjustment is appropriate when, "while the 'quality of representation' . . . was first-rate, the work done clearly was performed at levels of efficiency that were within the usual range of these experienced lawyers' skills."[50] The district court's own description of the level of representation in this case makes clear that the work done was not exceptional, but rather performed at levels one should expect from these lawyers.[51]

## IV. CONCLUSION

On remand the court should first determine appellees' general entitlement to attorneys' fees in this case. If the court finds that fees are appropriately granted, it should then conduct an evidentiary hearing to determine the reasonable number of hours worked by Winfield, in light of the discussion in this opinion. The court should also determine the prevailing market rate in the District of Columbia for attorneys similar to Parker, Kohn, and Phillips, and in Mississippi for attorneys similar to Winfield. Having thus calculated the lodestar fee, the court should then determine an adjustment to the lodestar, if any is deemed appropriate, based on the contingent nature of this suit and on the delay in receipt of payment, if the hourly rates used in calculating the lodestar are not present hourly rates. The court may not include an upward adjustment for the quality of representation, as we have held that court's own opinion shows that such an adjustment is unwarranted.

*Reversed and remanded.*

---

**48.** Mem. op. at 2–3, *reprinted in* J.A. at 14–15.

**49.** We note also that if the district court felt that, say, one of the four attorneys had performed unusually well, it should have awarded an adjustment only for that attorney's lodestar amount. The special quality of one lawyer's services provides no logical basis for granting all the lawyers a quality adjustment.

**50.** 672 F.2d 42, 64 (D.C.Cir.1982). *See also id.* at 60–61, *quoted at* note 42 *supra.*

**51.** *Copeland* also provides, under the rubric of quality of representation, that the court may adjust the lodestar upward if the attorney has "obtained an exceptional result for the client." 641 F.2d at 894. This means a result substantially better than could reasonably have been expected. The district court properly did not rely on that standard below, as the result obtained here was not exceptional, even though it was an important one which furthered the goals of the Voting Rights Act.